UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:09-cr-00024-JAW |
| | ) | |
| JAMES M. CAMERON | ) | |

**SENTENCING ORDER**

James M. Cameron stands convicted of thirteen child pornography counts and now faces sentencing. Calculated under the United States Sentencing Guidelines, Mr. Cameron's guideline range falls between 262 to 327 months— between just under 22 years and just over 27 years in prison.

## I.   BACKGROUND

On August 23, 2010, at the conclusion of an intense six-day jury-waived trial, the Court found James Cameron guilty of thirteen child pornography offenses. *Oral Ct. Verdict* (Docket # 179).

## II.   THE SENTENCING GUIDELINES AND CHILD PORNOGRAPHY

### A.   Sentencing Issues: An Overview

Mr. Cameron raises numerous arguments against the application of the United States Sentencing Guidelines to his convictions. *Mr. Cameron's Mem. in Aid of Sentencing* (Docket # 223) (*Def.'s Mem.*). The first challenge is to the underlying legitimacy of U.S.S.G. § 2G2.2, the section of the guidelines applicable to Mr. Cameron's child pornography crimes. *Id.* at 27–30. The second series of arguments are technical under the guidelines and address how the Court should calculate the

total offense level in this case under § 2G2.2. *Id.* at 30–76. After the guideline range is calculated, Mr. Cameron urges the Court to impose a non-guideline sentence under 18 U.S.C. § 3553(a) of five years, levy no fine, and order no restitution to the victims. *Id.* at 76–103.

### B. The Guideline Calculations and Judicial Disquiet

#### 1. The Child Pornography Sentencing Guidelines

The United States Sentencing Commission's guidelines for child pornography offenses are found in § 2G2.2. The guidelines create two different base levels for child pornography offenses. For those convicted of possession of an obscene visual depiction of a child (such as a drawing), a violation of 18 U.S.C. § 1466A(b); simple possession of child pornography, 18 U.S.C. §§ 2252(a)(4) or 2252A(a)(5) or the production of child pornography that is an adapted or modified depiction of a child, 18 U.S.C. § 2252A(a)(7), the guidelines set a base offense level of 18. U.S.S.G. § 2G2.2(a)(1). For those convicted of more serious child pornography offenses, including transportation of child pornography, 18 U.S.C. § 2252(a)(1) and (b)(1), or its receipt, 18 U.S.C. § 2252A(a)(2) and (b)(1), the guidelines set a base offense level of 22. U.S.S.G. § 2G2.2(a)(2). Mr. Cameron was convicted of one possession offense but twelve more serious offenses; his guideline calculations began at 22.

#### 2. The Probation Office Guideline Calculations

Beginning at a base offense level of 22, the Probation Office determined that Mr. Cameron was subject to a number of enhancements. Presentence Report ¶¶ 18-32 (PSR). First, because some images depicted minors who had not reached the age

of 12, he was subject to a 2 level increase for prepubescent minor.  U.S.S.G. § 2G2.2(b)(2).  Second, because he traded images for other images, he was subject to a 5 level increase.  U.S.S.G. § 2G2.2(b)(3)(B).  Third, because some images displayed sado-masochistic conduct, he was subject to a 4 level increase.  U.S.S.G. § 2G2.2(b)(4).  Fourth, because he used a computer to possess, transmit, receive, or distribute the images, he was subject to a 2 level increase.  U.S.S.G. § 2G2.2(b)(6).  Finally, because he possessed more than 300 but fewer than 600 images, he is subject to a 4 level enhancement.  U.S.S.G. § 2G2.2(b)(7)(C).  Because Mr. Cameron contested the charges and put the Government to its proof, he did not receive a 3 level reduction for acceptance under U.S.S.G. § 3E1.1.

These enhancements quickly added up.  Mr. Cameron went from a base offense level of 22 to an adjusted offense level of 39.  Mr. Cameron has no prior criminal history.  For a person with a total offense level of 39 and a criminal history category of I, under the Probation Office calculations, the applicable guideline range for Mr. Cameron is 262 to 327 months or from just under 22 years to 27¼ years.

### 3.  Crime and Enhancement

Pointing to judicial decisions and publications from the United States Sentencing Commission, Mr. Cameron attacks the "overarching reasonableness" of the guidelines under § 2G2.2.  *Def.'s Mem.* at 27.  Mr. Cameron has a point.  Some of these enhancements make good sense; others are almost invariably present in a child pornography offense and are so intertwined that if one is present, the others are as well.  No one would quarrel with the two level enhancement for a

3

prepubescent minor under the age of twelve, since it responds to the common sense precept that the younger the child the worse the offense.  U.S.S.G. § 2G2.2(b)(2).  If anything, only a two-level increase for sexually exploiting the youngest and most vulnerable children seems too lenient.

However, once this enhancement is applied, other more significant enhancements are almost certain to be applied.  If a defendant is guilty of trafficking in child pornography, it is rare that the pornography does not contain images of children under twelve.  In fact, the Sentencing Commission statistics state that a prepubescent enhancement is found in 94.8 percent of child pornography trafficking cases.  *See* United States Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics for Fiscal Year 2009* at 36 (*Specific Offense Characteristics 2009*).  Furthermore, it is virtually guaranteed that he used a computer to get them; the Sentencing Commission reports that for fiscal year 2009, 97.2% of defendants convicted of trafficking in child pornography received the "use of a computer enhancement."  *Id.* at 37.  The four-level increase for sado-masochistic conduct will also apply to most defendants.  The First Circuit "agree[s] with the many circuits which have found that images depicting the sexual penetration of young and prepubescent children by adult males represent conduct sufficiently likely to involve pain such as to support a finding that it is inherently 'sadistic' or similarly 'violent' under the terms of § 2G2.2(b)(4)."  *United States v. Hoey*, 508 F.3d 687, 691 (1st Cir. 2007).  Therefore, when the image is one of child pornography involving a child under the age of twelve, it is not always true that the

sado-masochistic four-level enhancement applies, but it is almost always true. The Commission statistic is that this enhancement applies in 73.4% of trafficking cases. *Specific Offense Characteristics 2009* at 37. Mr. Cameron is also subject to the number of images enhancement. He is being held responsible for over 300 but less than 600 images, a four-level increase. U.S.S.G. § 2G2.2(b)(7)(C). Under the guidelines, possession of a video, video-clip, movie or similar depiction counts for 75 images. U.S.S.G. § 2G2.2, Comment 4(B)(ii). Four video-clips and the four-level increase applies—as it often does. Someone obsessed with child pornography is rarely satisfied with a few images so this numerical enhancement almost always applies to some degree. The Commission says that a numerical enhancement applies in 96.9% of the cases. *Specific Offense Characteristics 2009* at 37. The last enhancement, for trading images, is not nearly as common; it applied in 13.8% of trafficking offenses in 2009 according to the Sentencing Commission. *Id.* at 36.[1]

For the sentencing court, particularly in a contested sentencing, the focus should, in this Court's view, be first on the victim. How young was the child? What does the image demonstrate the child endured? What does the nature of the harm to the victim say about the defendant? The second focus should be on the defendant. Most importantly, how likely is it that he will recidivate? What clues does the defendant's family background, criminal history, the nature of the pornography, the mental health history, the length of time of his criminality, his

---

[1]This statistic does not mesh with this Court's experience. Increasingly, child pornography defendants seem to be accessing groups, chat rooms, or other niches of the internet often password protected where the participants trade images. Perhaps there is a lag time between developments on the internet, investigation, prosecution, sentencing, and Commission statistics.

age, his support system, and the other factors give the sentencing court about his danger to the community?  There are other concerns but these are the two main ones.  Instead, in a contested case, the guidelines require the Court to engage in the sad and useless duty of counting the images.

The point is not that a defendant who has a peculiar interest in prepubescent children should not be severely punished; he should.  Moreover, a defendant who is obsessed with prepubescent children should be punished more severely than those attracted to older teens.  At the same time, the Court acknowledges that the First Circuit has upheld these enhancements, noting that "the sentencing enhancements fairly capture[] different dimensions of . . . conduct."  *United States v. Stone*, 575 F.3d 83, 96 (1st Cir. 2009).  As the Court discusses later, each of these enhancements is justifiable.  The point is that elsewhere in the guidelines, enhancements are truly separate; here they are so intertwined that if one applies, the others almost invariably apply too and the result is an extremely high total offense level for most child pornography defendants, Mr. Cameron included.

### 4.    Other Offenses

Comparing guideline sentences among the most serious crimes is usually an unproductive exercise in grading degrees of reprehensibility for crimes for which there are no easy moral equivalents.  For the victim of a bank robbery, a burglary, price fixing, or organized crime, the repercussions are often devastating.  Even among the most horrific crimes, the Court readily accepts that child pornography

stands apart because of the tender ages of its victims, its ruinous impact on their lives, and the debasing effect of the crime on society as a whole.

At the same time, a criminal history score of 39 is an extraordinarily punitive result for a first time offender of any crime under the guidelines. Someone could enter a bank, rob it of $10,000.00, in the process fire a weapon and cause serious bodily injury to a teller, and he would end up with criminal history score of 33 and would face a guideline sentence of 135 to 168 months.[2] *See* U.S.S.G. § 2B3.1. A less violent and less successful bank robber, who merely passes a death threat to a teller and makes off with $10,000.00, faces a guideline range of 51 to 63 months. *Id.* The base offense level for second degree murder is 38 and would be treated more leniently. U.S.S.G. § 2A1.2(a). Profoundly serious drug trafficking offenses do not begin to reach a total offense level of 39 unless the drug quantities reach an industrial scale or the defendant has a history of serious drug convictions; the base offense level for trafficking in 30,000 kilograms or 66,000 pounds of marijuana is 38. U.S.S.G. § 2D1.1(c)(1).

Even when other sexual offenses against minors are concerned, a total offense level of 39 is punitive. The actual criminal sexual abuse of a minor under the age of sixteen starts with a base offense level of 18 and a guideline range of 27 to 33 months. U.S.S.G. § 2A3.2(a). Thus, under the guidelines, Mr. Cameron is subject to nearly a ten-fold greater punishment for possessing images of someone else sexually abusing a minor than he would receive if he had committed the actual

---

[2] To compare comparables, all these calculations assume that the defendant, like Mr. Cameron, did not receive acceptance of responsibility under U.S.S.G. § 3E1.1.

abuse himself.  The guidelines assign the horrific crime of selling or buying a child for use in the production of pornography with a base offense level of 38, a lower level of punishment than Mr. Cameron is currently facing.  U.S.S.G. § 2G2.3(a).

The Court's point is not to criticize the guideline ranges for other crimes. Consistent with *Kimbrough*, the Court views the advisory guideline range as an excellent starting point.  *United States v. Kimbrough*, 552 U.S. 85, 91, 108 (2007). Often, after applying the § 3553 factors, it concludes that the guideline range is the proper ending point.  Instead, these comparisons give a sense of proportionality.

### 5.   Other First Circuit Cases

There have been some recently reported cases in the First Circuit involving the sentences for child pornography and similar offenses.

### a.   *United States v. Madera-Ortiz*

On February 25, 2011, the First Circuit addressed a case in which a man entered into an internet chat room and initiated a sexually explicit conversation with someone he thought was a thirteen year old girl.  *United States v. Madera-Ortiz*, No. 10-1474, 2011 U.S. App. LEXIS 3754, at *1-2 (1st Cir. Feb. 25, 2011).  She was not; she was an agent of the Department of Homeland Security.  *Id.* at *2.  In the ensuing exchange, Mr. Madera-Ortiz transmitted webcam footage that showed him touching his genitals and masturbating, and over the next five months, Mr. Madera-Ortiz initiated a total of seven instant messaging conversations with this "girl" and each of these contacts featured the transmission of obscene materials.  *Id.*

Mr. Madera-Ortiz ended up pleading guilty to transferring obscene materials to a minor, a violation of 18 U.S.C. § 1470.  *Id.*

Because of the nature of the charges, a different section of the guidelines applied: Transferring Obscene Matter to a Minor.[3]  *Id.* (referring to U.S.S.G. § 2G3.1).  Instead of a base offense level of 22, Mr. Madera-Ortiz started with a base offense level of ten.  *Id.*  He received two enhancements: a five-level enhancement because the offense involved someone he thought was a minor and a two-level enhancement for use of an interactive computer service in the commission of the offense.  *Id.*  He received a three-level reduction for acceptance of responsibility, which amounted to a total offense level of 15 to 21 months.  *Id.*  He appealed the district court's sentence of 21 months, which the First Circuit readily affirmed.  *Id.*

### b.   *United States v. Stone*

In 2009, the First Circuit upheld a 17.5 year (210 month) sentence for a defendant who pleaded guilty to knowingly transporting and shipping child pornography.  *United States v. Stone*, 575 F.3d 83 (1st Cir. 2009).  In *Stone*, the Illinois police set up a Yahoo! internet account under the screen name "brownhairedgirl_1"; the publicly available profile revealed she was a 15 year old.  *Id.* at 85.  The Defendant contacted her over the internet and began a series of sexually explicit discussions.  *Id.*  He sent child pornography to her, provided a link to other child pornography, and masturbated in front of a webcam as it was sent to her.  *Id.*  Mr. Stone ended up with almost exactly the same computations as Mr.

---

[3] Although it is not entirely clear, the Court assumes that the obscene material that Mr. Madera-Ortiz sent to the person he thought was a thirteen year old girl was adult, not child pornography.

Cameron, except he received a five-level enhancement because he distributed the material to someone he believed to be a minor, a five-level enhancement for more than 600 images, and a three-level reduction for acceptance. *Id.* at 86-87. His total offense level was 37 and the guideline range was 210 to 262 months, the top end of which was reduced to 240 months because of the statutory maximum of twenty years. *Id.* at 86-87 n.5.

The First Circuit affirmed the 210 month sentence but added a postscript:

> We add a coda. Sentencing is primarily the prerogative of the district court, and the sentence in this case is within permissible limits. There is no error of law and no abuse of discretion. That said—and mindful that we have faithfully applied the applicable standards of review—we wish to express our view that the sentencing guidelines at issue are in our judgment harsher than necessary. As described in the body of this opinion, first-offender sentences of this duration are usually reserved for crimes of violence and the like. Were we collectively sitting as the district court, we would have used our *Kimbrough* power to impose a somewhat lower sentence.

*Id.* at 97.

### 6.    Other Circuits; Other Courts

Although in *Stone* the First Circuit upheld a guideline sentence with a cautionary coda, other circuits have reversed even within guideline child pornography sentences as too harsh. The Second and Third Circuit have each issued appellate opinions openly critical of the current child pornography guidelines. *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010); *United States v. Grober*, 624 F.3d 592 (3d Cir. 2010).[4] A number of sentencing judges have explained

---

[4] In *Dorvee*, the district court calculated the guideline range to be the same as it is here 262 to 327 months, but it was capped at 240 months to reflect the statutory maximum. 616 F.3d at 176-177. The range was arrived at by applying similar but not identical calculations. *Id.* The district court

their discomfort with the child pornography guidelines and their decision to impose non-guideline sentences in child pornography cases. *See United States v. Stern*, 590 F. Supp. 2d 945 (N.D. Ohio 2008); *United States v. Johnson*, 588 F. Supp. 2d 997 (S.D. Iowa 2008); *United States v. Baird*, 580 F. Supp. 2d 889 (D. Neb. 2008); *United States v. Hanson*, 561 F. Supp. 2d 1004 (E.D. Wis. 2008).

The judicial disquiet with the guidelines for child pornography offenses is commonly based on the conclusion that U.S.S.G. § 2G2.2 was not developed pursuant to the Sentencing Commission's characteristic institutional role.[5]  *Grober*, 624 F.3d at 608-09.  The Commission exercises its characteristic institutional role when it develops its guideline provisions from "empirical data and national experience, guided by professional staff with appropriate expertise." *Id*. at 608.  But with § 2G2.2, the Commission did not use this empirical approach and instead, in response to congressional directives, it "cobbled together [sentencing enhancements] through this process [that] routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases." *Dorvee*, 616 F.3d at 186.  The Commission acknowledged the unusual development of § 2G2.2, United States Sentencing Commission, *The History of the Child Pornography Guidelines*, (Oct. 2009) *available at* *http://www.ussc.gov/Publications/Offense_Types/index.cfm*, and it has "openly

---

sentenced the defendant to 233 months.  *Id*. at 178.  On appeal, the Second Circuit reversed, concluding that the district judge had erroneously calculated the guideline range and that the sentence was substantively unreasonable.  *Id*. at 179.  In *Grober*, the district court calculated the guideline range to be 235 to 293 months.  624 F.3d at 595.  The sentencing judge imposed a non-guideline sentence of 60 months.  *Id*. at 596.  The Third Circuit, in a split decision, affirmed the 60 month sentence.  *Id*. at 611.

[5] *Grober*, *Dorvee* and other courts have thoroughly explained the background for this conclusion.

opposed these Congressionally directed changes." *Dorvee*, 616 F.3d at 185. The Commission noted that "if the base offense level were set any higher than 22, the typical offender sentenced under §2G2.2 for receipt of child pornography would face a higher guideline than a typical offender convicted of conspiracy to commit murder and kidnapping." *The History of Child Pornography Guidelines*, at 47–48.

### 7.   Conclusion

Mr. Cameron urges the Court to conclude that it would be unreasonable in his case to apply the specific offense characteristics in § 2G2.2. *Def.'s Mem.* at 30. The Court is fully cognizant of its authority to "consider requests for variant sentences premised on disagreements with the manner in which the sentencing guidelines operate." *United States v. Rodriguez*, 527 F.3d 221, 231 (1st Cir. 2008). Moreover, the Court retains this authority "even where a guideline provision is a direct reflection of a congressional directive." *Stone*, 575 F.3d at 89.

This Court joins other courts which have expressed unease with § 2G2.2 and the escalating impact of its enhancements. At the same time, it notes that judicial criticism has not resulted in a wholesale rejection of the guideline ranges for the appropriate case. Thus, in *Stone*, the First Circuit refused to say that district courts must always reject the § 2G2.2 enhancements, 575 F.3d at 96; *United States v. Maulding*, 627 F.3d 285, 287–88 (7th Cir. 2010); *see United States v. Huffstatler*, 571 F.3d 620, 623 (7th Cir. 2009), and it affirmed a guideline sentence observing that the defendant had not merely possessed child pornography but had engaged in "probing sexual questions and a lewd performance for someone he believed was a

minor." *Stone*, 575 F.3d at 96.   In sum, the Court will treat the guideline calculations as a "starting point and the initial benchmark" for its sentencing analysis under 18 U.S.C. § 3553(a).  *Gall v. United States*, 552 U.S. 38, 49 (2007).   It will then proceed to the § 3553(a) analysis, aware of the guideline sentence and the Court's view that the guideline sentence enhancements in § 2G2.2 are flawed because the calculation often results in "harsher than necessary" sentences.  *Stone*, 575 F.3d at 97.

### C.   Guideline Issues

Mr. Cameron has raised numerous guideline calculation issues.  The Court addresses them separately.

### 1.   Prepubescent Minor:  U.S.S.G. § 2G2.2(b)(2)

Mr. Cameron does not dispute the fact that some of the individuals depicted in the pornography he possessed were less than 12 years old and he "accepts responsibility in that regard."  *Def.'s Mem.* at 30.  Mr. Cameron, however, disputes the number of images depicting individuals under the age of 12 and he argues that the proportion of these images when compared to other images does not justify the enhancement.  *Id.* at 30-32.  He claims that even though the Government's expert, Dr. Ricci, identified 107 images as depicting persons under 18 years of age, some of those images may be of individuals who are "both prepubertal and *older* than 12." *Id.*   at 31 (emphasis in original).   He also points out that of the 324 images submitted to Dr. Ricci, 217—or about 67%—"either did not depict minors or were unclassifiable due to the absence of physiological clues."  *Id.*  Asserting that there

was a pool of 1,858 images, he says the prepubertal images constituted only 3% of that group.  *Id.* at 32.  To impose a two-level prepubertal enhancement in these circumstances would be, in Mr. Cameron's view, "both unsubstantiated and unreasonable."  *Id.*

The Court could not disagree more.  The prepubertal enhancement unequivocally applies to Mr. Cameron's collection of child pornography.  Even under Dr. Ricci's extremely conservative assessment and even eliminating from those images the children who could remotely be over the age of 12, Mr. Cameron still possessed a substantial number of images of very young children engaged in sexual activity, more than meriting this enhancement.  Some of the children were very young girls, some toddlers and some babies.  Many images depict adult males having oral, vaginal or anal sex with these very young children.  It credits Mr. Cameron little to dispute the application of this enhancement.

### 2.   Distribution for Non-Pecuniary Gain: U.S.S.G. § 2G2.2(b)(3)(B)

Mr. Cameron objects to the 5 level increase for "distribution for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain."  U.S.S.G. § 2G2.2(b)(3)(B).  Mr. Cameron contends that the trial evidence "did NOT establish that Mr. Cameron engaged in *quid pro quo* image exchanges."  *Def.'s Mem.* at 32 (emphasis in original).  He points out that by his calculation 61% of the images "did NOT involve images that are classifiable as child pornography."  *Id.* (emphasis in

original).    He says that the application of this enhancement would be "unsubstantiated and unreasonable." *Id.* at 32-33.

The Court disagrees.  The guideline application notes clarify that in a case involving the bartering of child pornography, a "thing of value" is "the child pornographic material received in exchange for other child pornographic material bartered in consideration for the material received."  U.S.S.G. § 2G2.2, cmt. n.1. The trial evidence includes an extended discussion between the "user" and a person with the screen name "kinkybink." *Gov't Ex.* GX 50E(5)(b).  They discuss the fact that Yahoo! closed their accounts and they had switched to "hello", presumably referring to GoogleHello.  Referring to GoogleHello, the "user" says, "plus its better for trading pics!"  Kinkybink then sent "user" 13 pictures, three of which show prepubescent children engaged in sexual activity.  Upon receipt, "user" responds that the images were "WILD."  Kinkybink asks for some "pix".  User then sends a series of images containing child pornography.  This is not all.  The trial record contains evidence of numerous chats between the local user, Mr. Cameron, and with others, sometimes with attached images of child pornography and sometimes without the images.

The Court need go no further.  The Court finds based on the evidence that "user" is Mr. Cameron and contrary to Mr. Cameron's emphasized position in this case, the trial evidence contains sufficient evidence to establish that he bartered images of child pornography for other images of child pornography.

### 3.    Sado-masochistic Conduct:  U.S.S.G. § 2G2.2(b)(4)

The Probation Office assessed a 4-level increase for sado-masochistic conduct under U.S.S.G. § 2G2.2(b)(4). The PSR refers to images depicting adult males having sex with prepubescent children; it refers to an image of a minor engaged in sexual contact with a canine and another in which a young female was tied to a medical table. PSR ¶ 7. Mr. Cameron objects because he says these images were not submitted to Dr. Ricci for age-determination, were not encompassed by the counts of conviction, and were not identified by Dr. Ricci as depicting minors. *Def.'s Mem.* at 33. Furthermore, he says that the 4-level increase would be "wildly disproportionate against the background of the thousands of images related to this case, the vast majority of which were not (or not proven to be) child pornography of any kind." *Id.* He says the increase would be "both unsubstantiated and unreasonable." *Id.*

The Court disagrees. In its response, the Government refers specifically to images, which were admitted at trial, that show adults engaged in sexual relations, including adult male penetration, with prepubescent children under the age of 12.[6]

---

[6] The Court found the image in Count 15 "eating_13.jpg" that the Government referred to in its memorandum. *Gov't Mem.* at 9-10 (Ct. 15, Encase Report Image 6). Summary Chart of Dr. Ricci's Review of Images at 8). The image is too small to confirm the age of the person and Dr. Ricci stated that the person was either pubertal or he could not tell. *Gov't Ex.* 63-SC (Summary Chart of Dr. Ricci's Review of Images at 8). The Court does not count this image toward the sado-masochistic enhancement. The Count 15 image appears to be a person strapped to a medical table with her legs spread but the image is so small, the Court could not confirm it was a minor. *Id.* The Court located the Count 4 image of a prepubescent minor with her wrists bound and agrees with the Government that it is an image of sado-masochistic behavior. The main point, however, is that the number of images of adults, mostly males, having sexual relations with prepubescent minors under the age of 12 as determined by Dr. Ricci is simply overwhelming. *See* Ct. 3 img.29.jpg (middle left); Ct. 4 img.148.jpg; Ct. 6, img.162.jpg; img.172.jpg; img.175.jpg; img.502.jpg; img.587.jpg; img.591.jpg;img.613.jpg; img.482.jpg; Ct. 9 69.jpg; 75.jpg; Ct. 13 FO-2701; FO-25838; FO-29060; FO-99565; FO-189912; Ct. 14 img.11.jpg; img.21.jpg; img.24.jpg; img.30.jpg; img.37.jpg; img.41.jgp; img.69.jpg; img.92.jpg; img.93.jpg; img.98.jpg; img.99.jpg; img.101.jpg; *Ct.* 15 69.jpg; 74.jpg; 76. jpg; 87.jpg; 97.jpg;

*Gov't's Second Mem. in Aid of Sentencing* at 9-10 (Docket # 229) (*Gov't's Second Mem.*).  Contrary to Mr. Cameron's contention, there is substantial and reasonable evidence to apply the sado-masochistic enhancement as this enhancement has been interpreted by the First Circuit.  *Hoey*, 508 F.3d at 691.

### 4.    Use of a Computer:  U.S.S.G. § 2G2.2(6)

Mr. Cameron "does not deny that his misconduct involved the use of a computer." *Def.'s Mem.* at 33.  In fact, the Government points out that he used four computers.  *Gov't's Second Mem.* at 10.  However, Mr. Cameron says that application of this enhancement would be "unreasonable" because "the use of technology is not so extraordinary that it requires an increased punishment." *Def.'s Mem.* at 33.

The Court disagrees with Mr. Cameron.  Here, the trial evidence revealed that Mr. Cameron was extremely sophisticated in his use of the computer.  He adopted screen names, some with girls' names and some ostensibly from outside the United States.  He used four different computers, resorted to different software programs, and employed wiping software.  He also used the computer to trade images of child pornography with others.

Moreover, a defendant's use of a computer is what the victims of child pornography fear.  For many of these young people, as they grow older, they come to realize that it is their image as a child that is being swapped around the world and they live in fear that someone will recognize them, make assumptions about their sexuality, or pursue them.  As traumatic as being abused as a child must be, for the

child who knows the exploitation stopped, there is some comfort; for the child who knows the exploitation will never stop, because of the internet, there is not even the comfort of finality and anonymity.

Here, the use of a computer enhancement is appropriate.

### 5.   Number of Images:  U.S.S.G. § 2G2.2(b)(7)(C)

The Probation Office recommended that Mr. Cameron receive an enhancement for possessing between 300 and 600 images of child pornography. PSR ¶ 7 (calculating the number of images at 546).  Mr. Cameron objects, saying that the total number of images of child pornography is 107, thereby allowing for an enhancement of 2, not 4 levels, a figure he later revised downward to 94 images. *Def.'s Mem.* at 34; *Defense Resp. to the Gov't's First Mem. in Aid of Sentencing* at 6 (Docket # 232) (*Def.'s Resp.*).   The Government says that the number of child pornography images equals "at least 547 images."  *Gov't's First Mem. in Aid of Sentencing* at 1 (Docket # 222) (*Gov't's First Mem.*).

The main disagreement focuses on whether the Court should count images that the Government's expert, Dr. Ricci was unable to identify as being of children. The Government's exhibit summary chart counts each pornographic image as an image of child pornography, including images that Dr. Ricci said were either pubertal or he could not tell.   *Id.* Attach. 1.   Mr. Cameron protests that the Probation Office and Government calculations are "remarkably erroneous and ignore[] the significance of Dr. Ricci's testimony."  *Def.'s Mem.* at 34.  He reiterates these arguments with even greater force in his response.  *Def.'s Resp.* at 1-6.

The Court turns to Dr. Ricci's testimony.  *Tr.* (Docket # 214).  Dr. Ricci was the Government's expert witness at trial.  He finished medical school in 1973 and is a Board certified expert in child abuse pediatrics.  *Tr.* 3:10-19.  Dr. Ricci's expertise includes assessing the developmental level of children.  *Tr.* 5:24-6:1-2.  He said that typically an individual is described as prepubertal until the age of 11 or 12, although nowadays some children develop earlier.  *Tr.* 6:18-24.

Dr. Ricci explained the Tanner Scale, a standardized means of assessing the level of a child's development.  There are five stages: Tanner I through V:

> Stage I is prepubertal; that is, no evidence of secondary sexual development, no estrogen effect, no testosterone effect, all the way up through Stage V which is fully mature sexually.  Menses for girls usually starts somewhere between stages two and three.  We start to see some pubic hair development and some breast development in both boys and girls—boys, of course, not breast development—at Stage II is when we first start seeing this development, and then it gradually progresses through a series of stages to full maturity, which is Stage V.

*Tr.* 7:9-19.  Dr. Ricci stated that Tanner Stage I is "no sexual development." *Tr.* 26:10-12.

Tanner Stage II is "the early stages of puberty where there is [a] very little bit of pubic hair, very little bit of breast development, so that's very early stages of sexual development." *Tr.* 26:16-20.  Dr. Ricci said that females usually reach Stage II, the development of pubic hair and breast development, by age 12 plus or minus 2.  *Tr.* 9:10-20.  In other words, 14 is usually the outer limit for Stage II and 10 is the lower limit.  *Id.*  Stage III, where there is further development, has a mean age of 14 and a half or 15.  *Tr.* 27:15-17.  Stage IV is 15 and a half to 16.  *Tr.* 27:18-21.

In his evaluation of the persons in the images, Dr. Ricci used what he acknowledged was an extremely conservative approach.  If the person had "some breast development and pubic hair development", he was "not prepared to say that the person is under 18."  *Tr.* 15:10-15.  To be a minor, namely under 18, Dr. Ricci used Tanner Scale I exclusively and he conceded that his insistence on Tanner Scale I is "probably the most conservative I've ever run across."  *Tr.* 15:19-20.   Other colleagues use Tanner Scale II but he "will not do that."  *Tr.* 15:20-23.

Dr. Ricci's highly conservative test for assessing whether a person depicted in an image is less than 18 may be appropriate during trial where the Government bears the burden to prove each element of the case beyond a reasonable doubt.  At sentencing, however, the standard is more likely than not, and to count against Mr. Cameron, the Government is required to prove that the individuals in the images are more likely than not to have been under the age of 18.  To prove that it is more likely than not that someone is under 18, it is not necessary to make sure that they are developmentally 14 or younger.

Mr. Cameron insists that in counting the number of images, the Court must accept Dr. Ricci's Tanner I opinions and cannot include any images of children above a Tanner I.  *Def.'s Mem.* at 34.  In other words, if they have any sexual development at all, they cannot be children.  The Court disagrees.  It previously addressed this question in its Order on Post-Trial Motions and for the reasons in that Order and further explained here, the Court as a factfinder is not bound by Dr. Ricci's opinions. *Order on Post-Trial Mots.* at 15-19 (Docket # 218).

The brief answer is that the legal standard for the age of children for purposes of the child pornography law is "any person under the age of eighteen years." 18 U.S.C. § 2256(1). It is not Tanner I. To exclude all children who have any sexual development at all from protections against child pornography would be contrary to law.

The question Mr. Cameron presses is whether the Court can make an age assessment contrary to Dr. Ricci's opinion. The answer is basic. A factfinder is not compelled to accept the testimony of an expert. *See* JUDGE D. BROCK HORNBY'S 2010 REVISIONS TO PATTERN CRIMINAL INSTRUCTIONS FOR THE DISTRICT COURTS OF THE FIRST CIRCUIT § 2.07 (updated 12/23/10). Assessing the images against this lesser standard, the Court disagrees with Mr. Cameron that all images Dr. Ricci was unable to say were Tanner Stage I must be excluded from the numerical calculation under § 2G2.2(b)(7).

Dr. Ricci was presented with a disc of pornographic images and asked whether the persons depicted in the images were children. He reviewed the images and expressed an opinion: 1) that the person was either prepubertal; or 2) that they were pubertal or he could not tell. For a few individuals, who appeared more than once, however, Dr. Ricci drew contradictory conclusions, saying for some images they were prepubertal and for others that they were pubertal or he could not tell. In Counts IV and V, there is an image of two young girls exposing themselves on a couch, and Dr. Ricci says they are prepubertal. *Gov't Ex.* 63-SC, *Summary Chart of Dr. Ricci's Review of Images* at 2 Ct. IV img.28.jpg; at 2 Ct. V img.10.jpg (*Summary*

*Chart*).  These same girls appear in Counts XII, XIV and XV in a different but equally exposed pose.  However, Dr. Ricci says that the girls in these images are either pubertal or he could not tell.  *Id.* at 5 Ct. XII img.15; at 7 Ct. XIV img.31.jpg.

Similarly, in this case, one of the victims, "Amy" of the "Misty" series has requested restitution.  *Letter from James R. Marsh to United States Att'y* (Oct. 19, 2010).  In his letter, Mr. Marsh reveals that at the time of the abuse which resulted in the "Misty series", "Amy" was either 8 or 9 years old.  *Id.* at 2.  In his extremely conservative assessment, Dr. Ricci concluded that the one image of "Amy" among the Cameron pornographic images was "either pubertal or can't tell."  *Gov't Ex.* 63-SC, *Summary Chart of Dr. Ricci's Review of Images* at 2 Ct. IV, imp.23.jpg, img.94.jpg, img.121.jpg (the same image appears three times).  Knowing that a person that Dr. Ricci could not identify as being under the age of 18 was either 8 or 9 supports the Court's conclusion that Dr. Ricci's expert opinions were conservative to a fault.

It has been the Court's onerous duty to review and re-review these images with care and detail to determine first whether the Government had proved Mr. Cameron guilty and second to respond to the numerous sentencing issues that have arisen.  The Court is confident that it is more familiar with these images than Dr. Ricci.

It is not necessary to reject Dr. Ricci's testimony.  Instead, the Court has applied his explanation of the Tanner Scale and his approach to assessing age and has used its own common sense to determine age.   Here, the Government

introduced a video depicting a man having sexual intercourse with a young girl. *See Gov't's First Mem.* Attach. 1 Ct. 3 (img.1.mpg). Dr. Ricci said the young girl was "pubertal or can't tell." *Id.* However, having viewed the video, the Court readily concludes that it is more likely than not that the girl in the video is less than 18 years old. She is much smaller than the male and she has virtually no apparent secondary sexual development. The same is true for the other two videos, which show oral sex being given by young females to adult males. *Id.* Attach. 1 Ct. 6 (img.1.mpeg; img.2.wmv). Based on the size and physical characteristics of the females' faces, neither appears any older than 10; they are certainly not 18 or older. The Court counts each of the three videos under the § 2G2.2(7) calculation for a total of 225 images. *See* U.S.S.G. § 2G2.2, Comment 4(B)(ii) ("Each video, video-clip or similar visual depiction shall be considered to have 75 images.").

Dr. Ricci testified that 107 images depicted minors but his definition of minor was no sexual development. *Def.'s Mem.* at 34. When the videos are included and added to 107, the result is more than 300 images and the 4-level enhancement applies. When Dr. Ricci's number is added to the people in the images that the Court has found are more likely than not are minors, the total number of child pornography images is well in excess of 300 and closer to 600.

### D.    Objections to the PSR

#### 1.    Number of Images and Proportionality

Mr. Cameron "contends that the number of contraband images and illegal images of very young children is "very small as compared to the total number of

images that were seized" *Def.'s Mem.* at 40.  Mr. Cameron has engaged in elaborate statistical analysis of the total number of images against the total number of images that Dr. Ricci confirmed were children and he urges the Court to conclude that "only 107 of the relevant 324 images depict minors" and that when the number of contraband images is compared with the total number of images "nearly three-quarters . . . of the images were NOT classified as contraband." *Id.* at 48 (emphasis in original).  He then says that when the number of child pornography images is compared against the total number of images, the percentage of child pornography images is "proportionally minimal." *Id.* at 50.

The Court disagrees on a number of levels.  It has already explained why it is not bound by Dr. Ricci's numbers.  To extrapolate from Dr. Ricci's numbers and compare them to the total number of pornographic images is an exercise in futility and compounds the exclusion of images of all children beyond Tanner I.  Moreover, each of the child pornography images that Mr. Cameron possessed and/or transported is contraband.  The underlying logic of the proportionality argument is that because Mr. Cameron had a large collection of pornographic images that from his viewpoint were not child pornography, this somehow mitigates his possession of what he admits is 107 images of child pornography.  Finally, the images of child pornography that he admits he possessed are not benign.  They are vile and reprehensible depictions of adults having sex with very young children, occasionally even babies.  To argue proportionality is to miss the point.

### 2.   Save-All Images

Mr. Cameron reiterates his previous argument that the images found in his Yahoo! Messenger and on GoogleHello should not be included because these software programs had an automatic save device and the Government failed to prove that Mr. Cameron downloaded these images. *Def.'s Mem.* at 50-53. The Court addressed this issue in its post-trial order and resolved it against Mr. Cameron. *Order on Post-Trial Mots.* at 21-22.

### 3.   Obstruction of Justice: U.S.S.G. § 3C1.1

The Probation Office did not assess an obstruction of justice enhancement under U.S.S.G. § 3C1.1. It explained that although Mr. Cameron used wiping software to avoid detection, there was no indication he used it after learning of the investigation and therefore the Probation Office did not recommend the enhancement. PSR ¶ 9. Despite the fact the Probation Office did not recommend the enhancement, Mr. Cameron objects. *Def.'s Mem.* at 54-55. He contends that "the evidence supports a conclusion that the software was utilized in order to avoid any meaningful possession of child pornography" and therefore the language in the PSR "would have a tendency to prejudice the Court in its deliberations over sentencing because it disparages Mr. Cameron." *Id.* at 54.

The Court overrules Mr. Cameron's objection. The trial evidence confirms that Mr. Cameron installed wiping software and contrary to his protestations, the Court concludes that the reason he installed the software was to allow his continued search for child pornography without detection.

### 4.   Acceptance of Responsibility: U.S.S.G. § 3E1.1

The Probation Office declined to recommend that Mr. Cameron receive acceptance of responsibility under § 3E1.1.  Mr. Cameron objects.  He says that he "exercised his right to a trial in order to raise genuine constitutional questions, including evidence-rule-based due process challenges."  *Def.'s Mot.* at 56.  He therefore claims he fits within the "rare situation" where a defendant goes to trial yet is entitled to a reduction for acceptance of responsibility.  *Id.* at 55-56 (quoting U.S.S.G. § 3E1.1, comment n.2).

After trial, Mr. Cameron met with the Probation Office and admitted that he had become obsessed and addicted to sexually explicit chat on the internet.  PSR ¶ 10.  He said that as he continued to chat, oftentimes pictures would be exchanged.  *Id.*  He claimed that he right-clicked on the images and saved them but he often did not even look at the images.  *Id.*  In essence, he said that he was obsessed not by the images but by the chat and he claimed he "never solicited any illegal pictures and was not interested in them."  *Id.*

The Court refuses to apply a reduction for acceptance of responsibility under § 3E1.1.  Regardless of whether he raised legitimate legal issues during his trial, the trial evidence does not support Mr. Cameron's current exculpatory and minimizing view of his conduct.

### 5.  Children Younger Than 12:  U.S.S.G. § 2G2.2(b)(2)

The Probation Office assessed a two-level increase for child pornography that "involved a prepubescent minor or a minor who had not attained the age of 12 years."  PSR ¶ 20 (citing U.S.S.G. § 2G2.2(b)(2)).  Mr. Cameron objects.  He says

that the prepubescent enhancement "fails to provide any documentation of proportionality" and that this enhancement is "conduct that occurs in virtually all child pornography cases." *Def.'s Mem.* at 59.  For the reasons earlier stated, the Court rejects the proportionality analysis.  Again, the Court accepts Mr. Cameron's point about the inevitability of escalating guideline ranges resulting in sentences that are occasionally harsher than necessary.  For guideline calculation purposes, the Court applies the two-level enhancement under § 2G2.2(b)(2).

### 6.    Distributing Images:  U.S.S.G. § 2G2.2(b)(3)(B)

The Probation Office recommended a five-level enhancement since the offense involved "distribution for the receipt . . . of a thing of value, but not for pecuniary gain."  PSR ¶ 21 (citing U.S.S.G. § 2G2.2(b)(3)(B)).  Mr. Cameron objects to this enhancement on the ground that it applies to virtually all child pornography cases and should not be applied to the facts in his specific case. *Def.'s Mem.* at 61-63.

The Court has previously addressed this issue.  The Court applies the enhancement.

### 7.    Sadistic or Masochistic Conduct: U.S.S.G. § 2G2.2(b)(4)

The Probation Office recommended a four-level increase since the offense "involved material that portrays sadistic or masochistic conduct."  PSR ¶ 22 (citing U.S.S.G. § 2G2.2(b)(4)).  Mr. Cameron objects to this enhancement on the ground that "the images described in the PSR were NOT among the 324 images upon which the PSR's sentencing findings are otherwise based" and "were not evaluated by Dr. Ricci." *Def.'s Mem.* at 63.  Further, Mr. Cameron says that this enhancement

27

"occurs in virtually all child pornography cases" and should not be applied to him. *Id.*

The Court previously addressed this issue. The Court applies the enhancement.

### 8. Use of a Computer: U.S.S.G. § 2G2.2(b)(6)

The Probation Office recommended a two-level increase since the offense "involved the use of a computer." PSR ¶ 23 (citing U.S.S.G. § 2G2.2(b)(6)). Mr. Cameron objects to this enhancement saying that enhancement applies to conduct that "occurs in virtually all child pornography cases" and should not be applied to him. *Def.'s Mem.* at 65.

The Court previously addressed this issue. The Court applies the enhancement.

### 9. Number of Images: U.S.S.G. § 2G2.2(B)(7)(C)

The Probation Office recommended a four-level enhancement since the offense "involved at least 300 images, but fewer than 600" images. PSR ¶ 24 (citing U.S.S.G. § 2G2.2(B)(7)(C)). Mr. Cameron objects on the ground that Dr. Ricci's expert testimony does not support this number of images, that a number of the images are duplicates, and that this enhancement applies in "virtually all child pornography cases." *Def.'s Mem.* at 67-70.

The Court has previously addressed most of these objections. Regarding the duplicate issue, even assuming that duplicates do not count (and the Court is not

certain they should not), the number of separate images of child pornography is still in excess of 300. The Court applies the enhancement.

### 10. Ability to Pay a Fine

The Probation Office recommended that the Court impose a fine on Mr. Cameron, finding that he has the ability to pay a fine. PSR ¶ 54. Mr. Cameron objects, saying that disbarment proceedings are in process in Maine and Michigan, that his startup business is generating little profit, that his child pornography convictions are going to restrict the places where he might obtain employment, and that Mr. Cameron is currently indigent. *Def.'s Mem.* at 70-71.

Under the guidelines, the Court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). The Court agrees that Mr. Cameron has sustained this burden and it will not impose a fine.

## III. THE § 3553(a) ANALYSIS

### A. Mr. Cameron's § 3553(a) Analysis

In his Memorandum, Mr. Cameron urges the Court to impose a sentence substantially outside the guideline sentence range of 262 to 327 months. *Def.'s Mem.* at 72-96. First, relying on judicial criticism of the harshness of the guidelines, Mr. Cameron urges the Court to give the resulting guideline range little weight. *Id.* at 75-6. Second, turning to the nature and circumstances of the offense, Mr. Cameron stresses that there is no evidence of direct contact with underage children and, performing a detailed statistical analysis, that the volume of child pornography

images when compared with the total number of images was comparatively low.  *Id.* at 77-87.  Regarding the history and characteristics of the defendant, Mr. Cameron emphasizes his family background, his upbringing in Michigan, his education, and his employment as a prosecutor with the Somerset County District Attorney's Office and the Maine Office of the Attorney General, including responsibility for oversight of all drug prosecutions.  *Id.* at 87-89.  Turning to the seriousness of the offense, Mr. Cameron admits the "depictions of child pornography are disturbing, inexcusable and unlawful."  *Id.* at 89.  He attributes his descent into child pornography from six causes: 1) the progressive deterioration of death of his parents; 2) difficulties in caring for a third family member; 3) challenges within the Attorney General's Office; 4) demands from a book that he was writing; 5) lifelong problems with obsessive-compulsive disorder; and, 6) a change of medication used to treat his obsessive-compulsive disorder.  *Id.*  Though he admits that "[a]ny involvement whatsoever with child pornography is intrinsically wrong", he argues: 1) that he never had actual contact with minors; 2) that he never attempted to contact minors; 3) the ratio of child pornography to legitimate images "was very very low"; 4) that there is no evidence contraband was saved to create a collection; 5) that the child pornography was systematically deleted; 6) there is no evidence of wide-scale distribution; and, 7) that his child pornography activities occurred sporadically.  *Id.* at 90-91.  He believes that a 60 month sentence will promote respect for law and will allow for atonement and rehabilitation.  *Id.* at 91.  Noting that he has suffered "wide-ranging and enduring sanctions", including the loss of his job, his profession,

his reputation, and his marriage, he urges the Court to consider these other impacts in assessing just punishment. *Id.* at 91-92. Turning to deterrence, he disputes the likelihood that he will ever return to his prior obsession with child pornography. *Id.* at 92-93. Regarding educational and vocational training, Mr. Cameron acknowledges he is well educated; he does intend "to pursue relevant therapy during and after his imprisonment." *Id.* at 93. Mr. Cameron acknowledges that the Court is limited by statute in the kinds of sentences it may impose; for Counts 1, 3-7, and 9-14, the term of incarceration is at least five years and no more than twenty years and the Count 15 conviction requires a prison term between zero and ten years. *Id.* at 93-94. 18 U.S.C. § 3553 requires the Court to consider the guideline sentence range and Mr. Cameron again urges the Court to depart from that range. *Id.* at 94. Finally, regarding restitution, Mr. Cameron cites *United States v. Berk*, 666 F. Supp. 2d 182 (D. Me. 2009) and argues that the victims have not demonstrated any damage causally connected to Mr. Cameron's criminality. *Def.'s Mem.* at 94-96.

Mr. Cameron proposes the Court impose a five year term of incarceration, no order of restitution, and no fine. *Id.* at 102.

### B.     The Government's § 3553(a) Analysis

The Government urges the Court to impose a guideline sentence. First, it lists child pornography sentences in this District and argues that the majority of the child pornography sentences in this District has been within the guideline range. *Gov't's Second Mem.* at 10-12. Turning to the § 3553(a) factors, the Government

points out that Mr. Cameron grew up in an intact family, graduated from college and law school, worked as an Assistant Attorney General for eighteen years, and had an intact, long-term marriage. *Id.* at 23. The Government notes that during the execution of the search warrant, Mr. Cameron, who knew then that he was guilty, suggested that his son might have been responsible for the child pornography images. *Id.* at 24.

The Government is skeptical of Mr. Cameron's asserted impecunity. It notes that after this investigation commenced, he and his wife divorced and as part of the settlement, he transferred real estate valued at $315,000 to his ex-wife as well as his interest in a business, effectively "divest[ing] himself of all significant assets." *Id.* at 25. The Government urges the Court to disregard Mr. Cameron's argument that he has never had inappropriate contact with a child, essentially arguing that the absence of an aggravator does not amount to a mitigator. *Id.* at 26-27.

The Government views the nature and circumstances of Mr. Cameron's crimes as egregious. It points to the number of images, the young ages of many of the victims, the use of wiping software, the use of assumed screen names, the trading of child pornography images, the graphic language of his internet chats, the fact that these offenses took place while Mr. Cameron was a state prosecutor, his self-confessed addiction to child pornography, his minimization of his conduct, and his misrepresentations of his conduct to Stephen Thomas, a Licensed Clinical Social Worker, leading to the issuance of an exculpatory report on his likelihood of recidivism. *Id.* at 27-36.

32

## C.   Discussion

After calculating the applicable guideline sentence range, a sentencing court is required to sentence a defendant in accordance with a set of factors set forth in 18 U.S.C. § 3553(a).  *Gall*, 552 U.S. at 49-50.  The guideline sentence range "should be the starting point and the initial benchmark", but the court "should consider all of the § 3553(a) factors" and "may not presume that the Guidelines range is reasonable." *Id.*  The court is directed to make "an individualized assessment based on the facts presented", aware that "a major departure" from the guidelines range "should be supported by a more significant justification than a minor one." *Id.* at 50.

As the First Circuit recently explained, judges "must start out by calculating the proper Guidelines range", which encourages judges "to do their best to sentence similar defendants similarly" and promotes "uniformity and fairness." *United States v. Rodriguez*, 630 F.3d 39, 41 (1st Cir. 2010).  Once that calculation has been properly done, "judges can sentence inside or outside the advisory range, as long as they stay within the statutory range and consider the sentencing factors arrayed in § 3553(a)." *Id.*

### 1.   The Parsimony Directive:  18 U.S.C. § 3553(a)

The first statutory directive in § 3553(a) is the obligation to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of the statute.  18 U.S.C. § 3553(a).  The Court takes this directive seriously.

Here, the Court notes that all but one of the convicted offenses has a twenty-year maximum sentence, and the one exception carries a ten year maximum. The Government elected to prosecute Mr. Cameron based on the pornography discovered under different screen names. *Indictment* (Docket # 1). The dates of the crimes began on July 10, 2006 and continued through December 21, 2007. *Id.* The Court has no criticism of the Government for its charging decision but the Court views Mr. Cameron's course of conduct from July 10, 2006 through December 21, 2007 as a continuum. Although there are certainly crimes that merit separate punishment for separate incidents, the Court does not consider this to be one of them. Thus, even though the Court could impose a sentence of greater than 240 months for the multiple convictions, it will not do so.

The Court takes seriously the First Circuit's cautionary advice in *Stone*. 575 F.3d at 97. The Court was the sentencing judge in *Stone* and is aware that its facts bear a number of similarities to this case. Mr. Stone pleaded guilty to one count of knowingly transporting and shipping child pornography, a violation of 18 U.S.C. § 2252A(a)(1). *Id.* at 86. Mr. Stone had more child pornography images than Mr. Cameron, more than 600, and distributed the material to someone he believed to be a minor, but otherwise he received exactly the same guideline calculations, resulting in an adjusted offense level of 40 before acceptance. *Id.* Because, unlike Mr. Cameron, Mr. Stone accepted responsibility for the offense, his total offense level was reduced to 37. *Id.* Like Mr. Cameron, he had no prior criminal history

34

and was a Criminal History Category I.  *Id.* at 86-87.  His guideline range was 210 to 240 months of imprisonment.  *Id.*

In one way, Mr. Stone's case was more egregious than Mr. Cameron's.  Mr. Stone had not only downloaded and shared child pornography from the Internet, he had reached out to someone he thought was a fifteen year old girl, had engaged in multiple explicit online chats with her, had directed her to his online album of pornography, and had masturbated in front of a web camera that he thought she was viewing.  *Id.* at 85-86.  There is no evidence that Mr. Cameron ever crossed this line and contacted or attempted to contact a minor, which from the Court's perspective is a significant mitigating distinction between *Stone* and this case since to act on one's improper impulses signals a willingness to actually engage in predatory and risky behavior and to groom and victimize other children.

Yet in *Stone* the First Circuit expressed its view that the 210 month sentence, though lawful, was "harsher than necessary."  *Id.* at 97.  The three appellate judges concurred with the view that if they were collectively sitting as the district court, they "would have used [their] *Kimbrough* power to impose a somewhat lower sentence."  *Id.*

## 2.    The Nature and Circumstances of the Offense:  18 U.S.C. § 3553(a)(1)

The second statutory directive is to consider the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1).  Here, the Court considers several aggravating factors and some mitigating ones.  Turning first to the pornography itself, the

aggravating factors include the age of the children depicted in images, the extent to which they appear to be in physical or emotional pain, whether they are simply posing without clothes or photographed in a sexually suggestive manner, and whether they are pictured actually engaged in sexual relations: in general, the younger the child and the lewder the depiction, the more serious the crime.

Here, it appears that Mr. Cameron used different screen names to look for different types of pornography.  Under lilhottee, for example, the images are nearly all of girls during early puberty; under harddude, there are many images of very young children.  Although some images are of girls in their early teens which would pass as unremarkable in a family photo album, the juxtaposition of these otherwise commonplace images next to pornographic images is unsettling.  As mentioned, some of the images are of adult males engaged in sexual relations with very young children and are horrendous.  Here, the age of the children and the nature of the pornography are factors in support of a harsher sentence because of the unspeakable harm done to these children and its corrosive impact on society as a whole.

A second set of aggravating factors is Mr. Cameron's apparent computer expertise and his manifest attempts to conceal his illegal activities.  He assumed false screen names, at least one with an overseas address, and he installed wiping software to cover his tracks.  These are aggravating factors.

A third aggravating factor is Mr. Cameron's current explanation for his conduct, implausibly asserting that he was not interested in the pornographic images but in sexual chat and role playing.  The Court is not convinced.

A mitigating factor is that there is no suggestion that Mr. Cameron ever used the internet to contact or attempt to contact a minor.  The trial evidence indicated that he used the internet to find individuals who were willing to engage in sexual trysts but the targeted group was willing adults.  Unlike Adam Stone, Mr. Cameron was not engaged in sexual chatter with underage girls, never importuned them sexually, never distributed pornographic images to children, and never produced and sent pornography over the internet.

### 3.    History and Characteristics of the Defendant:  18 U.S.C. § 3553(a)(1)

Along with the "nature and circumstances of the offense," the statute directs the court to consider the "history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  How James Cameron became involved in the possession and transfer of child pornography will remain a mystery.  Many defendants in child pornography cases have themselves been abused as children and some have criminal records relating to sexual abuse.  Mr. Cameron has neither.  Mr. Cameron has some history of psychological problems that may help explain his conduct.  He has apparently suffered from some depression and has had a long-term problem with obsessive compulsive behavior.  He seems to attribute his criminal conduct with a change in medication for the obsessive compulsive disorder.  Mr. Cameron was professionally

successful, having completed college and law school and having worked in drug prosecution in the state of Maine, rising to lead the drug prosecution section at the state Attorney General's Office.  He had a long marriage and two children.  One child has special needs, which has caused some stress.  Still, there is nothing in Mr. Cameron's background, education, marriage, or family life that would explain this conduct.

Mr. Cameron's position as a high law enforcement official is an aggravating factor.  As the top drug prosecutor for the state of Maine, Mr. Cameron's criminality casts an unwarranted shadow on the integrity of other public officials and encourages public cynicism.

### 4.    The Seriousness of the Offense, Promoting Respect for Law, and Just Punishment:  18 U.S.C. § 3553(a)(2)(A)

Mr. Cameron clearly merits a significant punishment for his child pornography crimes.

### 5.    Specific and General Deterrence:  18 U.S.C. §  3553(2)(B), (C)

Mr. Cameron asserts he poses a low risk of recidivism.  He says the execution of the search warrant at his home "shocked [him] out of the behavior."  PSR ¶ 15. He relies in part upon an assessment by Stephen P. Thomas, LCSW, who conducted a series of long interviews with Mr. Cameron.  *Thomas Report* (Jun. 16, 2010) (Docket # 227).

Although the Court hopes Mr. Cameron will not reoffend, it is not certain. The first step is self-awareness. In his interviews with Mr. Thomas, Mr. Cameron frankly admitted that he had become "addicted to talking about sex and seeing those images." *Id.* at 3. In his interview with the Probation Office, however, Mr. Cameron said that the photographs were not his "primary interest" and he would often not even look at the photographs that people were sending him. PSR ¶ 11. Instead, Mr. Cameron "found sexually explicit chat to be stimulating." *Id.* ¶ 10. The Court is dubious and wonders what Mr. Cameron's attempt at minimization bodes for his future conduct.

Turning to general deterrence, the high profile nature of this case in light of Mr. Cameron's professional employment means that the Court's sentence will likely be widely distributed and may have a greater deterrent impact than a similar sentence in the average case.

### 6. Educational and Vocational Training and Other Correctional Treatment: 18 U.S.C. § 3553(a)(2)(D)

Mr. Cameron is well educated and is unlikely to benefit from further vocational training. To the extent there is counseling available for sex offenders, Mr. Cameron has expressed an interest in participating. None of this, however, affects the length of his sentence.

### 7. The Kinds of Sentences Available: 18 U.S.C. § 3553(a)(3)

The Court has broad discretion in Mr. Cameron's case. For the trafficking and receipt counts, it must impose a sentence of at least five years and the

maximum sentence per convicted count is twenty years. 18 U.S.C. § 2252A(b)(1). The maximum term of incarceration for Count XV, possession, is ten years. 18 U.S.C. § 2252A(b)(2). The Court could impose consecutive sentences that would far exceed Mr. Cameron's life expectancy.

### 8.   The Sentencing Guidelines: 18 U.S.C. § 3553(4), (5)

The statute requires that the Court consider the guidelines and the recommended sentence range. The Court has done so.

### 9.   Unwarranted Sentencing Disparities: 18 U.S.C. § 3553(a)(6)

This is a significant factor. One of the goals of the Sentencing Commission was to bring uniformity to federal sentencing. In the post-*Booker*, post-*Gall*/*Kimbrough* world, the uniform application of the sentencing guidelines depends upon their reasonableness. Once sentencing and appellate judges resolve that the guidelines measure the wrong things or result in improper ranges, the guidelines lose their persuasive force. The guidelines under § 2G2.2 are at risk of practical irrelevance and defendants will increasingly be left to the disparate sense of justice among federal judges, which is what led to the guidelines in the first place.[7] As the *Stern* court put it:

---

[7] These disparities are reflected in the Sentencing Commission's Sourcebooks of Federal Sentencing Statistics. The Sourcebooks indicate that downward departure and below guideline sentence rates—not including government sponsored downward departures—for defendants subject to U.S.S.G. § 2G2.2 have increased in each of the last four fiscal years:[7]

    2006: 164 of 743 Defendants (about 22%)
    2007: 279 of 1,025 Defendants (about 27%)
    2008: 477 of 1,335 Defendants (about 35.7%)
    2009: 691 of 1,606 Defendants (about 43%)

> In the absence of coherent and defensible Guidelines, district courts are left without a meaningful baseline from which they can apply sentencing principles.  The resulting vacuum has created a sentencing procedure that sometimes can appear to reflect the policy views of a given court rather than the application of a coherent set of principles to an individual situation.

*Stern*, 590 F. Supp. 2d at 961.

In imposing a non-guideline sentence, it is true that some similarly situated defendants will be treated more severely; others will be treated much more leniently.  *See United States v. Diaz*, 720 F. Supp. 2d 1039, 1040-41 (E.D. Wis. 2010) (collecting cases of district court variant sentences from § 2G2.2).

### 10.    Restitution of the Victims: 18 U.S.C. § 3553(a)(7)

One victim, "Amy" of the "Misty" series, submitted a request for restitution. *Letter from James R. Marsh to United States Att'y* (Oct. 19, 2010).  The letter details the horrific abuse she sustained and the terrible lifetime consequences that have ensued.  *Id.*   In 2009, this District addressed a similar restitution request from "Amy" in *United States v. Berk*, and concluded that although "Amy" was a victim and was harmed by the defendant's possession of depictions of her sexual abuse, there was "nothing in the record showing a specific loss that was proximately caused by this particular Defendant's possession of the victim[']s images." 666 F. Supp. 2d 182, 191 (D. Me. 2009).  This Court has followed *Berk*.  *United States v. Fournier*, 09-14-B-W.  The Government confirmed that after being informed of *Berk*, "Misty's counsel has declined to submit a case-specific statement to address the

---

*See* UNITED STATES SENTENCING COMMISSION, ANNUAL REPORTS & SOURCEBOOK ARCHIVES, http://www.ussc.gov/Data_and_Statistics/archives.cfm.

deficiencies in his previous restitution requests and understands that this is likely to result in a denial of the claim for restitution." *Gov't's Second Mem.* at 36. Consistent with the prior rulings in this District, the Court declines to issue an order of restitution in this case.

## IV.   CONCLUSION

The Court imposes a sentence of 192 months imprisonment, ten years supervised release, no fine, no restitution, and a special assessment of $1,300.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 11th day of March, 2011